In re Barry ROSEN, Debtor.

**PLUMBERS JOINT APPRENTICESHIP AND JOURNEYMAN TRAINING COMMITTEE, Plaintiff,**

v.

Barry ROSEN, Defendant.

Bankruptcy No. 393–36103–elp7.
Adv. No. 94–3018.

United States Bankruptcy Court,
D. Oregon.

Feb. 9, 1995.

Philip Emerson, Portland, OR, for plaintiff Plumbers Joint Apprenticeship and Journeyman Training Committee.

Richard A. Slottee, Portland, OR, for debtor/defendant Barry Rosen.

## MEMORANDUM OPINION

ELIZABETH L. PERRIS, Bankruptcy Judge.

This is a proceeding to determine the dischargeability under 11 U.S.C. § 523(a)(8) of the debtor's obligation to repay plaintiff Plumbers Joint Apprenticeship and Journeyman Training Committee ("Training Committee") the costs of the debtor's participation in an apprenticeship program.

### BACKGROUND FACTS

United Association Local 290 ("Local 290") is a local labor union for employees in the plumbing, steamfitter and marine repair industries. The United Association Local 290 Apprenticeship and Training Trust Fund ("the Training Trust") was created to implement apprenticeship training programs. The plaintiff Training Committee administers the Training Trust's apprenticeship training program for plumbers.

Apprenticeship training programs are statutorily regulated by Chapter 660 of the Oregon Revised Statutes under the authority of a State Apprenticeship and Training Council and a State Director of Apprenticeship and Training appointed by the Commissioner of the Bureau of Labor and Industries. *See* ORS 660.120 and 660.170. The apprenticeship training programs are implemented and administered by local joint committees and state joint committees which, *inter alia*, propose and prescribe the standards for courses of study. ORS 660.135–137; ORS 660.155–157. ORS 660.126(1) sets forth certain minimum requirements for these standards, including a minimum number of hours of reasonably continuous work experience and related and supplemental instruction. The related instruction involves written or oral training relevant to the skills required in a particular industry. Generally, this is obtained through classroom instruction at a local community college, which charges tu-

ition identical to that paid by non-apprentice students enrolled in the community college. The apprentice may obtain credits for the related instruction courses to be applied to an Associate Degree of Applied Science from the community college.

Employee apprentices who are members of Local 290 must participate in the apprenticeship training program coordinated by the Oregon, Southwest Washington Plumbers JATC, which, pursuant to ORS 660.157(3), established its own program of related instruction. Apprentices in the Local 290 program are required to complete 216 hours of related instruction each year rather than the 144 hours recommended by ORS 660.157(1). The apprentices receive this related instruction at Local 290 facilities with materials and instructors provided by the plaintiff. Apprentices are required, however to pay tuition to Portland Community College for the related instruction courses provided by the plaintiff and in exchange, the apprentices receive credits that may be applied toward a degree from the college.

In 1989, the debtor began working as an apprentice plumber for Gormley Plumbing, a non-union employer, and enrolled in an apprenticeship training program consisting of on the job training and related instruction at Chemeketa Community College. In 1991, Gormley entered into a collective bargaining agreement with Local 290. As a result, the debtor became a union member and was required to enter the Local 290 apprenticeship training program administered by the plaintiff. In order to participate in the program, in September of 1991, the debtor signed a Scholarship Loan Agreement with the Training Committee in which the debtor and the Training Committee agreed that the cost of training and the amount of the "scholarship loan" for the nine month period in question was $3,313.44 and that for the nine month period the committee would provide training to the debtor worth at least this "amount loaned." The Agreement provided that the scholarship loan may be repaid by the debtor in full either in cash or by in-kind credits which would be received for each year the debtor worked as a journeyman pursuant to a collective bargaining agreement for an employer making payments to the committee or an affiliated apprenticeship training committee. The agreement further provided that if the debtor worked as a non-union plumber he would be in breach of the agreement and all amounts due and owing on the "Scholarship Loan" would be immediately due and payable. The debtor also paid tuition to Portland Community College to obtain credits for the related course instruction.

The debtor was terminated from the apprenticeship training in February of 1992. Subsequently the debtor became employed as an apprentice plumber with a nonunion employer. Ultimately, the debtor was forced to discontinue his apprenticeship training when he aggravated a prior injury. The debtor's injury has created a permanent disability that prevents his employment as a plumber.

The Training Committee sued the debtor in state court for breach of the Scholarship Loan Agreement and obtained a judgment against the debtor for $1,656.72 in damages, $1,600 in attorney fees and $100.72 in court costs. The debtor filed a Chapter 7 petition on October 20, 1993. The Training Committee filed this adversary proceeding alleging that the debt set forth in the judgment is nondischargeable under 11 U.S.C. § 523(a)(8).

## DISCUSSION

11 U.S.C. § 523(a)(8) provides that a discharge under Chapter 7 does not discharge a debtor from a debt

> for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless—
>
> > (A) such loan ... first became due more than 7 years ... before the date of the filing of the petition; or
> >
> > (B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

■ The parties raise two issues under this section. The first is whether the debtor's obligation under the Scholarship Loan Agreement and the resulting judgment is the type of obligation that is within the scope of section 523(a)(8). The second issue is whether the obligation should nevertheless be discharged on the basis of undue hardship. The Training Committee bears the burden of proof on the first issue while the debtor bears the burden of proof on the latter issue. *In re Raymond,* 169 B.R. 67, 69 (Bankr. W.D.Wash.1994).

## A. *The Nature of the Debt.*

The debtor contends that this obligation is not within the scope of section 523(a)(8) for three reasons: (1) because it is not an "educational" obligation; (2) because it is not an obligation for an educational benefit overpayment or loan or to repay funds received as an educational benefit, scholarship or stipend; and (3) because the obligation was not incurred under a program funded by a nonprofit institution.

1. *Is the Debt an Educational Obligation?*

■ The debtor's primary contention is that his obligation, whether it is characterized as a benefit overpayment, a loan or an obligation to repay funds received as a scholarship or stipend, is not an educational obligation that is within the scope of section 523(a)(8). In this regard, the debtor exhaustively examines the legislative history of section 523(a)(8), going back to the Higher Education Act of 1965 (20 U.S.C. § 1070) and tracing the evolution of the student loan nondischargeability provision from its genesis as a 1976 amendment to the Higher Education Act, *see* Pub.L. No. 94–482, § 127(a), 90 Stat. 2081, 2141 (1976), through its adoption as part of the Bankruptcy Reform Act of 1978 and through amendments to the provision in 1984 and 1990. The debtor relies upon this legislative history to contend that the term "educational" in this provision must be construed narrowly so that the provision applies only to obligations pertaining to education received at institutions of higher or post-secondary education. The debtor contends that the Training Committee's related training course of instruction and the obligation to

the plaintiff are not "educational" under this narrow construction.

I disagree with the debtor's contentions. I find no authorities addressing whether obligations pertaining to apprentice training programs, such as the program at issue in this case, are "educational" obligations within the scope of section 523(a)(8). Nevertheless, I determine that neither the plain language nor the legislative history supports the narrow construction of section 523(a)(8) proposed by the debtor. I further determine that the obligation at issue in this case is an "educational" obligation within the scope of section 523(a)(8).

■ The language of section 523(a)(8) refers to educational obligations. It is not limited to obligations pertaining to education received at institutions of higher or post-secondary education. The Higher Education Act, the nondischargeability provisions added to the Higher Education Act and the nondischargeability provisions originally enacted as part of the Bankruptcy Reform Act of 1978 may have been so limited. Subsequent amendments to section 523(a)(8), however, have significantly broadened its scope. Most significantly, prior to 1984, section 523(a)(8) barred the discharge, *inter alia*, of certain loans made under any program funded in whole or in part by a governmental unit or "nonprofit institution *of higher education.*" The Bankruptcy Amendments and Federal Judgeship Act of 1984, however, deleted the term "of higher education." The debtor would basically have me read the term back into section 523(a)(8) by imposing a post-secondary or higher education requirement. The language of the statute is not so limited.

■ Nor does the purpose of the statute require such a limited construction. As the debtor points out, the purpose of the educational loan nondischargeability provision is to preserve the solvency of student loan programs so that funds will be available for future students. *See, e.g., In re Palmer,* 153 B.R. 888, 893 (Bankr.D.S.D.1993). That purpose is applicable to the apprenticeship program at issue in this case.

The evidence reflects that the Training Trust relies upon contributions received from

signatory parties to collective bargaining agreements to fund its apprenticeship training program. These contributions are based upon compensable man hours worked by employees covered by collective bargaining agreements with Local 290. If, after completing his or her training, an apprentice continues working pursuant to a collective bargaining agreement for an employer who makes contributions to this or another apprenticeship training trust, the contributions based upon that person's employment will help pay the costs of the program, help maintain its solvency and help ensure its availability for future apprentices. This is reflected by the in-kind repayment credits afforded by the agreement for the years that the apprentice works as a journeyman. But, if the apprentice does not work pursuant to a collective bargaining agreement for an employer making contributions to a training trust, he or she will not be helping to repay the costs of the training. The failure to pay the obligation under to the Scholarship Loan Agreement, either by in-kind repayment credits or by cash payments will have the same negative effect on the solvency of the apprentice training program as a failure to repay any student loan will have on any student loan program.

The evidence also reflects that the apprenticeship training program at issue in this case is an educational program. There is no dispute that the program, through on the job training and classroom instruction, offered apprentices the opportunity to expand their knowledge of matters pertaining to the plumbing profession, enhance their professional capabilities, obtain the qualifications and experience necessary for a professional license and obtain college credits. The debtor makes much of the fact that he paid Portland Community College separately for the college credits and that the non-union apprenticeship programs offered these same benefits without the obligation to pay the amounts due under the Scholarship Loan Agreement. The obligation owed under the agreement and the union apprentice program, the debtor therefore contends, were not for an educational purpose, but were for the purpose of allowing union employers to

recruit and train their employees for the employer's benefit.

The uncontroverted evidence is, however, that the union apprenticeship program at issue in this case, offered much more extensive training than did the nonunion program. The amounts due under the Scholarship Loan Agreement were necessary to pay for instructors, facilities, materials and supplies provided by the Training Trust or the Training Committee, as opposed to the community college. The obligation under the Scholarship Loan Agreement was the debtor's share of the costs of these instructors, facilities, materials and supplies. This reflected the cost of the training provided to the debtor and was an "educational" obligation within the scope of section 523(a)(8).

### 2. Is the Debt for an Educational Benefit Overpayment, Loan, Scholarship or Stipend?

■ Although the debtor clearly owes a debt to the plaintiff, see 11 U.S.C. § 101(12), the debtor contends that it cannot be within the scope of section 523(a)(8) because it is not a debt for an educational benefit overpayment, for a loan or for an obligation to repay funds received as an educational benefit, scholarship or stipend. I agree with the debtor that there is nothing in the record suggesting that this obligation involves an educational benefit overpayment. I also agree that this obligation is not one to repay funds received as an educational benefit, scholarship or stipend because the debtor never received any funds from the plaintiff. See In re Najafi, 154 B.R. 185, 190 (Bankr. E.D.Pa.1993).

■ The remaining question is whether the debt is for a loan. Most courts that have examined the language under 523(a)(8) have broadly interpreted "loan" to include extension of credit for tuition and not to require the delivery of a sum of money. See In re Hill, 44 B.R. 645 (Bankr.D.Mass.1984) (a debtor incurred an educational loan when a university allowed the debtor to enroll and attend college while waiting for the approval of his student loan); In re Najafi, 154 B.R. 185 (Bankr.E.D.Pa.1993) (a debt owed to a college for attending two weeks of classes constituted an educational benefit loan); see

also *United States Dept. of Health and Human Services v. Smith,* 807 F.2d 122 (8th Cir.1986) (a grant awarded on the condition that a debtor practice medicine in a "physician shortage area" constituted an educational loan).

Based on this authority, I determine that the debt is for a loan under § 523(a)(8). According to the Scholarship Loan Agreement, the plaintiff extended credit for $3,313.44 to pay for the cost of the training program. The debtor acknowledged the money owed and received training by agreeing to pay the specified amount.

### 3. *Is the debt for a loan made under a program funded by a nonprofit institution?*

■ In the absence of the involvement of a governmental unit, section 523(a)(8) requires that the educational loan be made under a program funded in whole or in part by a nonprofit institution. Whether the loan at issue was made under such a program turns upon whether the Training Trust is a nonprofit institution. The plaintiff relies upon the Training Trust's tax exempt status under 26 U.S.C. § 501(c)(3) as an indication of its nonprofit status. The debtor contends that tax-exempt status is not, by itself, sufficient to establish nonprofit status under section 523(a)(8) and that the Training Trust's financial statements reflect accumulated cash which is not indicative of a nonprofit entity.

In determining that a credit union was not a nonprofit institution under section 523(a)(8), *In re Delbonis,* 169 B.R. 1, 3–4 (Bankr.D.Mass.1994), indicated that tax-exempt status under 26 U.S.C. § 501(c)(1) was not determinative and relied upon the common-law test of whether the entity has shareholders and pays dividends.

The Training Trust is exempt from taxation under 26 U.S.C. § 501(c)(3), which requires that no part of the net earnings of the entity inure to the benefit of any private shareholder or individual. Section 501(c)(1), the tax exemption provision relied upon by *Delbonis* and similar cases does not contain such a requirement. In addition, the Restated Agreement and Declaration of Trust does not provide the trustees of the Training Trust with authority to pay dividends. Rather, it requires the assets of the Trust to be held and applied for the exclusive purpose of providing apprenticeship and training instruction and for defraying reasonable expenses. The fact that the Training Trust may have accumulated assets does not mean that it is a for-profit enterprise under these circumstances. The uncontroverted evidence reflects that the Trust built up its cash reserves to build new facilities and purchase new equipment and that funds are not distributed to employees, stockholders or any entity affiliated with the Trust. Under these circumstances, the Training Trust is a nonprofit institution.

### B. *Undue Hardship.*

■ In determining whether the debt should nevertheless be discharged because excepting the debt from discharge would impose an undue hardship on the debtor and the debtor's dependents, I adopt the test set forth in *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395, 396 (2d Cir.1987), which requires the debtor to make a three part showing: (1) that the debtor's current financial status does not permit him to maintain a minimal standard of living for himself and his dependents if he is forced to repay the loan; (2) that the debtor's financial status is likely to persist for a significant portion of the repayment period; and (3) that the debtor made a good faith effort to repay the loan.

### 1. *Current Financial Status of Defendant.*

■ The first part of the test requires that I examine the debtor's current income and expenses. The evidence reflects that the debtor has current monthly expenses of $930. These expenses include a reasonable amount for rent, utilities, food, transportation, entertainment, storage and clothing. In addition, the debtor is obligated to pay $1,647 in child support arrearage, $350 in monthly child support for his two minor children, a $2,000 judgment for attorney fees incurred in child custody dispute, a $500 fine for a conviction for driving under the influence of alcohol and the attorney fees that he incurs in continuing dispute concerning child custody and visitation. The debtor is also obligated to obtain

health insurance for his two minor children, which he cannot afford, or pay 50% of all uncovered medical expenses. Finally, the debtor has a monthly counseling expense of $40. In contrast to these expenses, the debtor's income is $980 per month, after the $350 monthly obligation for child support, from time-loss worker's compensation benefits. The debtor has no significant assets or property.

Under the circumstances of this case, the debtor is currently unable to maintain a minimal standard of living for himself and his dependents. His income barely meets his monthly expenses even without accounting for the extraordinary expenses arising from his criminal conviction and his continuing child custody dispute. The debtor is unable to pay for health insurance for himself or his minor children. If the debtor were forced to repay the approximately $3,300 debt at issue in this case, he would be further unable to maintain a minimal standard of living.

### 2. *Future Financial Prospects for Defendant.*

The second inquiry focuses on whether the defendant's financial status is likely to persist. The evidence in this case reflects that, if anything, the debtor's financial status is likely to deteriorate in the future. The worker's compensation insurer responsible for his claim is in the process of terminating his claim which will result in the loss of his only source of income. The debtor's wrist injury has created a permanent disability which prevents his employment as a plumber. Other than his training as a plumber's apprentice, the debtor has received no education beyond a high school equivalency diploma. The debtor has no transferable skills obtained from his apprenticeship training or from his prior work experiences in various general labor positions. The evidence reflects that given the debtor's skills, education and experience, he will be unable to obtain employment paying more than $6.00 per hour. While the debtor is eligible for vocational retraining and further worker's compensation benefits while he is undergoing such training, there is no evidence in the record that the retraining will enable the debtor to obtain a better paying job.

In addition, the debtor's expenses are not likely to decrease in the near future. His child support obligation will continue for at least another seven years. There is no indication that the debtor has the ability to make payments to reduce the extraordinary expenses arising from the child custody dispute. In addition, if the debtor were to obtain employment, his monthly expenses are likely to increase by the approximate $100 per month he would be required to pay to obtain automobile liability insurance and the approximately $50 per month he would be required to pay to maintain an ignition interlock device until April of 1997. The evidence indicates that the debtor is likely to be unable to repay the debt to plaintiff for an extended period of time. Under these circumstances, I find that the debtor has satisfied the second prong of the *Brunner* test.

### 3. *Good Faith Effort To Repay.*

The final inquiry under *Brunner* looks to whether the debtor made a good faith effort to repay the loans, as measured by his or her efforts to obtain employment, maximize income and minimize expenses. *See In re Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993). In addition, this inquiry looks to whether the debtor's financial misfortune is self imposed through his negligence or irresponsibility in conducting his financial affairs. *See id.*

In this case, the debtor acknowledges that he has made no payments on his debt to the plaintiff. This does not mean, however, that the debtor has not made a good faith effort to repay. While some of the debtor's financial misfortune is self-imposed, the majority of the debtor's financial misfortune is not. It arises primarily from his wrist injury, which prevented his employment as a plumber, and from his divorce. Given the debtor's wrist injury and lack of training or experience that would qualify him for a well-paying job, I find that the debtor's reliance upon his worker's compensation benefits was a reasonable effort to obtain the maximum income possible to a person in the debtor's position. I also find from a review of the debtor's budget that he has attempted to minimize expenses. From these circumstances I find that the debtor has satisfied his burden of proving a

good faith effort to repay the debt to the plaintiff.

For these reasons, I find that excepting this debt from discharge would impose an undue hardship on the debtor and the debtor's dependents. In making this finding, I reject the plaintiff's request that I hold my determination in abeyance for a six month period. Under the facts of this case, holding this determination in abeyance would be an unwarranted infringement upon the debtor's right to a fresh start.

## CONCLUSION

For the reasons set forth above, I determine that the debt the debtor owes the plaintiff is a debt for an educational loan made under a program funded by a nonprofit institution. Nevertheless, I find that excepting the debt from discharge would impose an undue hardship on the debtor and his dependents. The debtor, therefore, is entitled to a judgment that the debt is dischargeable.

This Memorandum Opinion shall constitute Findings of Fact and Conclusions of Law as required by Fed.R.Bankr.P. 7052 and they shall not be separately stated.