**In re Stephen Allen REZENDES and L. Irene Rezendes,**

**Joint Apprenticeship Committee of United Association Local Union No. 307, Plaintiff–Appellant,**

v.

**Stephen Allen Rezendes, Defendant–Appellee.**

No. 2:04–CV–156.

United States District Court, N.D. Indiana, Hammond Division.

Dec. 28, 2004.

Thomas E Moss, Paul T Berkowitz and Associates Ltd, Chicago, IL, for Local 307 Joint Apprenticeship Committee of United Association now known as Local Union 210 Plumbers Joint Apprenticeship & Journeyman Upgrade Trust Fund, Appellant.

Paul Jeffrey Schlesinger, 8396 Mississippi Street Suite G, Merrillville, IN, for Stephen Allen Rezendes, Appellee.

### ORDER

RUDY LOZANO, Bankruptcy Judge.

This matter is before the Court on the appeal from the United States Bankruptcy Court for the Northern District of Indiana. For the reasons set forth below, the decision of the bankruptcy court is **AFFIRMED**.

## BACKGROUND

Stephen Allen Rezendes ("Debtor") entered into a contractual agreement with the Joint Apprenticeship Committee of United Association Local Union No. 307 ("JATC" or "Creditor") whereby Debtor was to receive the technical training necessary to work in the trade of plumbing and pipe fitting. The training that was received is decidedly educational in nature. In order to obtain this training, Debtor signed three scholarship/loan agreements, one for each year he was involved in the program. These agreements set the terms of Debtor's involvement in the program as follows: Debtor would be educated in the trade of plumbing and pipefitting; JATC would pay the expense of educating Debtor; Debtor would work for a plumbing and pipefitting employer which was also a signatory to the JATC agreement; and Debtor's work for such an employer would effectively pay for his education. Debtor could also breach the agreement by working for a non-signatory plumbing and pipefitting employer, thereby incurring liability to pay for his own education. Debtor could also have sought and found employment outside of the field of plumbing and pipefitting and not incur liability for the cost of his education.

Debtor, not having found steady work with a signatory employer while in the apprenticeship program, took a position with a non-signatory employer in the field of plumbing and pipefitting, thereby incurring liability for his educational expenses due to the contract between the parties. There is nothing which would lead the Court to believe, nor does the Court believe, that JATC had any responsibility whatsoever to provide Debtor with employment either while in the program or after its completion. Debtor only completed three of the five years of training necessary to become a Journeyman under Union guidelines.

JATC obtained a judgment in the amount of $6,254.60 against Debtor on November 20, 2001 in the United States District Court for the Northern District of Indiana (Case 2:01–CV–409). None of this judgment has been paid. Debtor became unable to work in the trade and subsequently filed for protection under the Bankruptcy Code, 11 U.S.C. §§ 101 *et. seq.* (2000).

The issue before the Court is whether the contract between the parties and its incidents created a student loan for the purposes of section 523(a)(8) of the Bankruptcy Code, thus making this debt nondischargeable. The bankruptcy court held that the agreement between the parties does not constitute an instrument fitting within the definition of section 523(a)(8), and as such, the debt of $6,254.60 is a dischargeable debt. This Court agrees.

## DISCUSSION

■■■ This Court has jurisdiction based upon 28 U.S.C. section 158(c), which provides that appeals from bankruptcy court are to be taken by the district court under the same general standard as a civil appeal would be taken from the district court. Thus, pursuant to Federal Rule of Civil Procedure 52, the Court reviews the bankruptcy court's findings of fact for clear error; the conclusions of law are reviewed under a *de novo* standard. Fed.R.Civ.P. 52; *Freeland v. I.R.S.,* 264 B.R. 916, 919 (N.D.Ind.2001) (internal citations omitted). The *de novo* standard "requires the district court to make an independent examination of the bankruptcy court's judgment without giving deference to that court's analysis or conclusions." *Oakley v. Freeland,* 287 B.R. 174, 175 (N.D.Ind.2002) (citing *Zygulski v. Daugherty,* 236 B.R. 646, 651 (N.D.Ind.1999); *Smoker v. Hill & Assocs., Inc.,* 204 B.R. 966 (N.D.Ind.1997)), *rev'd sub nom. on other grounds, In re Oakley,* 344 F.3d 709 (7th Cir.2003).

The bankruptcy court initially rejected contractual defenses which were raised by Debtor, and purported to avoid liability on the underlying contract. This portion of the order has not been appealed, nor has Debtor filed a brief with this Court or argued against this portion of the order in any way. Therefore, the Court will not further address this issue and assumes that the bankruptcy court correctly held in favor of JATC on this issue. Thus, the only issue before this Court is whether the bankruptcy court properly held that the scholarship/loan agreements ("agreements") do not fall within the purview of section 523, and are therefore dischargeable.

■ The policy of the Bankruptcy Code ("Code") is two-pronged. First, the Code is designed to provide an honest debtor with a fresh start. *Matter of Marchiando*, 13 F.3d 1111, 1115 (7th Cir.1994). Second, bankruptcy is not exclusively a debtor's remedy for his or her financial woes; the Code is intended to protect creditors' interests as well. *Id.* In keeping with these policy concerns, "exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." *In re Morris*, 223 F.3d 548, 552 (7th Cir.2000) (quoting *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir.1992)). In *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court ruled that a creditor that opposes discharge has the burden of establishing that the obligation is nondischargeable by a preponderance. *Id.* at 287, 111 S.Ct. 654

(stating, "[r]equiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between [debtors' fresh start and the protection of creditors' interests]."). Therefore, JATC must demonstrate by a preponderance of the evidence that it is able to bring the agreements within the strict confines of section 523's proscription of dischargeability for student loans and the like.

■ In determining whether JATC is able to do this, the Court looks to the plain meaning of the section, as the Court is charged with enforcing the statute according to its terms. *In re Chambers*, 348 F.3d 650, 655 (7th Cir.2003); *In re Mehta*, 310 F.3d 308, 311 (3d Cir.2002) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1498 (3d Cir. 1996)). The Court must, therefore, strictly construe section 523 using only the plain meaning thereof. *See Chambers*, 348 F.3d at 655; *Mehta*, 310 F.3d at 311 (citing *Ron Pair Enters., Inc.*, 489 U.S. at 241, 109 S.Ct. 1026; *New Rock Asset Partners*, 101 F.3d at 1498).

Section 523(a)(8) of the Bankruptcy Code essentially makes student loans and the like nondischargeable in bankruptcy. 11 U.S.C. § 523(a)(8).[1] This language applies to all situations of student loans funded by the government or nonprofit institutions. *Id.* The statute, by its terms, reaches educational benefit overpayments or loans made by the government, edu-

---

1. Section 523(a)(8) states:
   (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -
   (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit or made under any

program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

cational benefit overpayments or loans made by nonprofit organizations, educational benefit overpayments or loans made under programs funded by nonprofit organizations either in whole or in part, and obligations to repay funds received as an educational benefit, scholarship, or stipend. *Id.*

The purpose of section 523(a)(8) is to ensure that the funds available to finance higher education are not depleted by individuals exploiting both student loan programs and the Code by taking out loans, gaining an education, discharging the debt, and then taking advantage the higher earning power with no debt. *See Mehta,* 310 F.3d at 312 (stating "Congress was concerned about reported abuses of students who obtained the benefits of higher education while avoiding repaying student loans by declaring bankruptcy shortly after graduation.").

JATC argues that the agreements fall within section 523 in that they are an educational benefit loan made by a nonprofit organization. The Court thus only addresses whether the agreement created an educational loan. The only conclusion available, given the particular facts in this case, is that the agreement did not create an educational *loan* within the meaning of section 523 when construed strictly, in accordance with the Supreme Court's mandate in *Grogan.* Black's Law Dictionary defines "loan" as "an act of lending; a grant of something for temporary uses . . . A thing lent for the borrower's temporary use; esp., a sum of money lent at interest . . . ." Black's Law Dictionary 947 (7th ed.1999). At common law, "loan" was defined as something, such as money, lent to another with an obligation to repay. *See Chambers,* 348 F.3d at 657 (stating that

the Seventh Circuit uses the common law definition of "loan"); *Mehta,* 310 F.3d at 313 (stating that a loan is "(i) a contract, whereby (ii) one party transfers a defined quantity of money, goods, or services to another, and (iii) the other party agrees to pay for the sum or items transferred at a later date."); *see also In re Renshaw,* 222 F.3d 82, 88 (2d Cir.2000) (citing *In re Grand Union Co.,* 219 F. 353, 362 (2d Cir.1914)) (defining "loan" under common law). The common law definition adopted by the Seventh Circuit is the same definition as the Second and Third Circuits have adopted in *Mehta* and *Renshaw.* *Chambers,* 348 F.3d at 657 (citing *Grand Union,* 219 F. at 362 as paraphrased by *Renshaw,* 222 F.3d at 88).

This agreement does not constitute a loan under either of these definitions. Although the bankruptcy court determined that there are three categories, it is more accurate to understand the agreement as having two classes, the first of which is divided into two subdivisions. The first group is made up of those who must pay for their education. The first subdivision is made up of individuals who must pay by working for a union, signatory plumbing employer ("signatory"); the second is made up of individuals who must pay by remitting monetary payments to JATC. The second class is made up of those who do not have to pay anything back at all despite the fact that they have received training.

The first group is made up of those who train in the JATC program and go on to work as plumbers and pipefitters. Those who work for signatories pay for their education by working based upon a particular equation such that after five years the payments are complete.[2] Those who work

---

**2.** The scale is as follows: year one 10% paid off, year two 15% paid off, year three 20% paid off, year four 25% paid off, year five 30% paid off. This adds up to 100% payment. *See*

Apprentice Scholarship Agreement Between Apprentice and Joint Apprenticeship Committee.

for nonsignatory employers are considered to have breached the agreement and thus have incurred a requirement to pay the costs of their education by JATC. The second class is made up of those who receive some or all of their training from JATC but do not find work in the plumbing and pipefitting industry. These individuals are not required to pay for any of their education.

■ Because there is no obligation to repay, this cannot be a loan. *See Chambers*, 348 F.3d at 657 (stating that there must be an agreement as to repayment in order for an extension of credit for the purposes of education to be considered a loan). *Chambers* is not directly on point, but rather provides the framework within which the Court must analyze the present facts. Chambers took graduate courses from the University of Illinois at Chicago ("UIC") for which she did not pay. Chambers then filed for relief under Chapter 7 of the Code and received her discharge. UIC informed Chambers that it considered the amount not paid for the courses to be due and owing at that point, as UIC believed that the debt was a educational loan and thus nondischargeable under section 523(a)(8). The bankruptcy court held for Chambers and the district court affirmed. The Seventh Circuit also affirmed, holding that the extension of credit by an educational institution only falls within the definition of loan under two circumstances; first, when money changes hands; and second, when there is an agreement prior to or simultaneous with the educational services by which the institution extends credit. *Id.* at 657.

■ In holding that the debt was dischargeable, the Seventh Circuit adopted the reasoning in both *Mehta* and *Renshaw. Id.* at 656–58. It stated that the proper analytical framework for a decision as to whether a debt is an educational loan begins with the traditional definition of

"loan." *Id.* at 656. The intent of the parties and not the form will determine whether a loan was formed between them. *Id.* Mere awareness of an obligation to pay does not conclusively show that a loan was made between the parties; in fact, in this context the term loan should be construed narrowly. *Id.* at 656, 657. There must be something evincing a loan in order for the institution to prove that a loan exists because of the language in section 523. *Id.* at 657. Section 523(a)(2) uses the term "extension ... of credit" but subsection (a)(8) does not use this term, implying that the mere allowance of a payment at a later date, without more, does not constitute a loan. *Id.*

Clearly no funds changed hands in the present case, so if the agreements constituted loans they must fit within the second possibility. Citing *Chambers*, JATC claims that the fact that Debtor and JATC entered into an agreement by which JATC would accept later payment implies that the agreements fit within *Chambers'* second category. JATC claims that it entered into an agreement prior to or contemporaneous with the extension of the educational benefit to Debtor. Moreover, JATC correctly states that entering into an agreement to loan money by extending credit for educational purposes would fall within the nondischargeable category of loans. However, if there is no obligation to repay, or if an obligation to repay only arises after the fact, then a contemporaneous agreement has not been reached.

■ In the present case, the obligation to repay does not arise out of the agreement; rather, it arises out of entering into the trade after the education. The *Chambers* court clearly indicates that the agreement must include an obligation to repay the definite amount loaned or credit extended. *Id.* at 655. The agreement must include an obligation to repay, and the

agreement must be entered into contemporaneously with the extension of services. *Id.* at 655–56. Therefore, there must be a contemporaneous agreement between the parties that the amount will be repaid so long as the amount is extended; without such an obligation to repay, there is no loan. *See id.* Since the agreement contained an agreement to provide services of a definite value as well as an agreement to pay contingent not on the extension of services, but rather upon how the educational service was used in the future, there can be no loan. As there was no defined obligation to repay at the time the agreement was entered into, it is impossible to find that the intent of the parties at the time of the agreement was to enter into a loan agreement with one another.

Additionally, the recurrent reference to "breach" of the agreement having led to the obligation to repay belies the point that JATC is attempting to make. If the obligation to repay arose from a loan, then there could be no breach save for the lack of payment. JATC claims that Debtor breached the agreement and therefore must pay for his education. This clearly does not show any intent that the parties enter a loan agreement. JATC cannot have it both ways: either there was a loan, or there was a contract which could be breached, yielding an obligation to repay.

There are two conclusions which can be drawn from this. First, it is possible, based upon the wording in JATC's brief and the agreements, that the payment is essentially functioning as nothing more than a liquidated damages provision brought on by the breach of one of the contracting parties; namely, one who uses the training provided by the Union to benefit a party who has paid nothing for the benefit. Second, the purpose of this entire agreement has absolutely nothing to do with education and instead is nothing more than a union recruiting and retention plan.

There is nothing at all wrong with either conclusion, as contracts providing for liquidated damages are proper, and a union's efforts to recruit and retain members are also proper. Moreover, each of these two conclusions represents an inherent good. Providing a damage provision in a contract shows a contracting party the gravity of breaching the contract, and unions, in order to continue their place in the working world, must recruit new members and retain current membership. However, in neither case is the debt created nondischargeable because in neither case is there an educational loan.

As a tool of recruitment and retention, the agreement has no educational element and thus the multiple purpose argument made by JATC cannot stand. JATC argues that there are two purposes to the contract. The first is to train union plumbers. The second is to protect JATC funds from being misdirected to the benefit of those who do not participate in the funding. JATC argues that these two purposes are not mutually exclusive. In support of this argument, JATC states that loans can have more than one purpose, and the test for whether a loan is an educational loan is not whether there is a purpose other than the education, but rather whether there is an educational benefit provided by the loan. This is true; however, the argument begs the question by assuming that what exists between the parties is a loan in order to prove that it is an educational loan. The mistake made by JATC, once the circular nature of its argument is unraveled, is that it argues that there is an educational benefit derived by Debtor from the contract; therefore, the contract is an educational loan. As was determined above, there is no loan and therefore even if there was an educational benefit which may be related to the agreement, the agreement is not an educational loan.

JATC primarily relies upon two cases, neither of which are binding upon this Court, to make its argument. *In re Dressel,* 212 B.R. 611 (Bankr.E.D.Mo.1997); *In re Rosen,* 179 B.R. 935 (Bankr.D.Or.1995). Both of these cases are clearly distinguishable from the facts in the present case. Each will be dealt with in turn.

The *Dressel* court held that a similar program provided Dressel an educational loan which was not dischargeable unless an undue hardship existed. *Dressel,* 212 B.R. at 615. The distinction between *Dressel* and the case at bar is that Dressel was actually loaned funds to be used to pay the expenses of his participation in the program. *Id.* at 613. More strikingly different is the fact that the apprentice breached the agreement and incurred a duty to monetarily repay rather than paying by working off the debt by taking employment with any employer, "who does not have a collective bargaining agreement in the Sheet Metal Industry that provides for the payment of contributions to the NTF, the local Apprenticeship Committee or an affiliated Joint Apprenticeship and Training Committee." *Id.* at 614. Thus there is no second group of apprentices who are not liable to repay the costs expended by the training committee by virtue of being employed outside of the industry. Moreover, if there was such a group, this Court believes there would not have been a loan, and the Court would not be bound by the ruling in *Dressel.*

*Rosen* is even more clearly distinguishable. Rosen was involved in an apprenticeship program at a community college when his employer became a union employer and thereby became a signatory to the local JATC. Rosen was required to complete his training with the JATC, which required that he pay tuition to the local community college in Portland, Ore. Additionally, it was clear that the amount must be paid either by paying in cash, or in-kind by working it off. Again, there is no second group which does not need to pay for their education. Having stated that "[m]ost courts that have examined the language under 523(a)(8) have broadly interpreted 'loan' to include extension of credit for tuition and not to require the delivery of a sum of money," the court held that the agreement entered into created an educational loan. *Rosen,* 179 B.R. at 939.

The Seventh Circuit does not broadly interpret the term loan as it is used in section 523(a)(8). *Chambers,* 348 F.3d at 657 (citing *Grand Union,* 219 F. at 362 as paraphrased by *Renshaw,* 222 F.3d at 88). *Chambers* defined "loan" under the common law, and additionally, exceptions to discharge are to be construed narrowly, which is not consistent with the reasoning in *Rosen. Id.* Moreover, the lack of the second group, not liable for its debt, is telling as to intent to enter into a loan.

An educational benefit derived by Debtor is not how "educational loan" is defined in the cases cited for JATC's proposition; rather, the courts found that a loan existed between the parties and merely had to decide whether the loan was educational. But here, there is no loan, thus the issue of educational benefit is unnecessary to the determination. More simply, there can be no educational loan if there is no loan in the first place.

Moreover, even granting that the two purposes are entirely compatible, there is no change in the essential nature of the contract. JATC claims that the purpose is training union plumbers and protecting JATC's funds. If the program was really educational, the purpose would be training plumbers, not training union plumbers. The phasing of JATC's argument is itself evidence that the program is a recruiting and retention tool, not an educational program. The educational element is wholly subject to the promotion of the union.

This is further evidenced by the fact that the only party who must pay for the education by remitting monetary payments are those who work for a non-union plumbing and pipefitting operation. If Debtor had obtained employment in a different field, he would have escaped the penalty of having to pay. This clearly implies that the payment is not a repayment for educational benefit received, or for credit extended to an individual for an educational benefit.

Assume that four individuals enter the program at the same time, and each completes the program. One works for a union plumber, the second works for a non-union plumber, and the third obtains a highly lucrative position that is not for a union plumber nor for a non-union plumber, but nonetheless the third individual utilizes some of the skills received both in her work and in her daily home life. The fourth never uses a single thing that he learned in his classes, neither at work nor at home. Each of the four has received exactly the same benefit in terms of education. Assuming that each worked hard and learned as much as possible, both in hands-on training and in the classroom, all of them have the same skill and knowledge. Yet the third and fourth have no financial obligation to JATC, and the first, through obtaining work with a signatory plumber, pays by benefitting himself through (presumably) better working conditions, hours, and rate of pay, not to mention the protection of the Union in matters regarding his employment. The second, however, has incurred financial liability for the same benefit that the third and fourth received but did not have to pay for because they are not competing with the first and those like him. The second also must pay for the same educational benefit that the first received and is paying for by benefitting himself through presumably better work. If this contract was a loan, all four would have to pay for the education, but in reality, only two of four must pay. Even if this contract was a loan, if there was an educational benefit for which the money was lent, since all four received the exact same benefit, all four would have to pay for the benefit. If this contract was to be considered a loan, then persons two, three, and four would all have breached the contract by not paying for their benefit. As a result, the nature of the contract is not one of an educational loan for purposes of section 523(a)(8), and the debt was correctly discharged by the bankruptcy court.

*CONCLUSION*

For the reasons set forth above, the judgment of the bankruptcy court is **AFFIRMED**.